<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RYAN CUEVAS,<br><br>            Plaintiff,<br><br>v.<br><br>CITY OF JERSEY CITY,<br><br>            Defendant. | Civil Action No: 20-17555 (SDW)(AME)<br><br>**OPINION**<br><br>August 30, 2023 |

**WIGENTON**, District Judge.

Before this Court are cross-motions for summary judgment brought by Plaintiff Ryan Cuevas ("Plaintiff") and Defendant City of Jersey City ("Defendant") pursuant to Federal Rule of Civil Procedure ("Rule") 56. (D.E. 48, 49.) Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331, 1343, and 1367. Venue is proper pursuant to 28 U.S.C. § 1391. This opinion is issued without oral argument pursuant to Rule 78. For the reasons stated herein, Plaintiff's partial motion for summary judgment (D.E. 48) is **GRANTED IN PART AND DENIED IN PART**, and Defendant's motion for summary judgment (D.E. 49) is **DENIED**.

## I.    <u>BACKGROUND AND PROCEDURAL HISTORY[1]</u>

This lawsuit arises from Plaintiff's claims that Defendant, through the Jersey City Municipal Court ("JCMC"), discriminated against him on the basis of his disability in violation of

---

[1] Facts cited in this opinion are drawn from Plaintiff's Statement of Material Facts in support of his motion for partial summary judgment (D.E. 48-3), Defendant's Response to Plaintiff's Statement of Facts (D.E. 50-1), Defendant's Statement of Undisputed Material Facts in support of its motion for summary judgment (D.E. 49-2), Plaintiff's response to Defendant's Statement of Material Facts (D.E. 51-1), and the record documents cited therein. The facts are undisputed unless noted otherwise.

Title II of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("RA"), and the New Jersey Law Against Discrimination ("NJLAD"), by failing to provide him with an American Sign Language ("ASL") interpreter at multiple court hearings.  (*See generally* D.E. 1.)  As a result, Plaintiff—a deaf individual who communicates primarily in ASL—was unable to resolve a wrongly issued parking ticket, and thus was prohibited from driving, for nearly eight months.  (D.E. 48-3 ¶¶ 1–2, 26, 34, 61.)  The following events preceded the instant suit.

### A.  Plaintiff's Ticket and Driving Suspension

At 8:04 p.m. on August 22, 2019, Plaintiff was wrongly issued a ticket (the "Ticket") for parking his car in a bus lane, which was prohibited only between the hours of 7:00 a.m. and 7:00 p.m.  (D.E. 49-2 ¶ 24; D.E. 48-11 at 2.)  The Ticket was accompanied by a summons directing Plaintiff to appear at an in-person hearing at JCMC.[2]  (D.E. 48-3 ¶ 26; D.E. 48-11 at 2.)  Just days before that hearing, the New Jersey Motor Vehicle Commission ("NJMVC") informed Plaintiff in a letter dated January 17, 2020, that it was suspending his registration and driving privileges because of a separate infraction—his failure to present proof of liability insurance.  (*Id.* ¶ 40.)  Although Plaintiff promptly resolved the liability-insurance issue,[3] the NJMVC refused to reinstate his driving privileges until JCMC adjudicated the Ticket. (*Id.* ¶ 43; D.E. 51-1 ¶ 16.)  While his license was suspended, Plaintiff could not drive and thus was incapable of earning income from

---

[2] Although the Ticket indicates that Plaintiff's initial court hearing was scheduled for September 5, 2019, (D.E. 49-2 ¶ 8), the undisputed facts establish that it was rescheduled to January 22, 2020, (*id.* ¶ 9; D.E. 48-3 ¶ 27).  The reason for this four-month delay is unclear, (D.E. 48-3 ¶¶ 26–27; D.E. 49-2 ¶¶ 7–9); however, it is irrelevant for purposes of resolving the instant motions.

[3] Specifically, Plaintiff resolved the liability-insurance issue on February 5, 2020—less than three weeks after the date on the NJMVC letter.  (*Id.* ¶ 41.)  Immediately thereafter, however, NJMVC staff informed Plaintiff that his license would remain suspended until NJMVC received "a court pending letter for summons 8 680830," *i.e.*, the summons accompanying the Ticket.  (*Id.* ¶ 46; D.E. 48-11 at 2.)  A court pending letter is a letter from JCMC that informs the NJMVC not to suspend a person's license while the person is awaiting a court date to resolve a driving-related infraction.  (D.E. 48-3 ¶ 44.)

driving.  (D.E. 48-3 ¶ 70.)  The policies and proceedings surrounding the adjudication of Plaintiff's Ticket are the main subjects of this litigation.

**B.  JCMC and Interpreter Day**

JCMC holds multiple court sessions every weekday, and among other proceedings, it adjudicates parking tickets.  (*Id.* ¶¶ 9, 13.)  At JCMC, persons who do not require interpretive services typically can resolve parking tickets during their first or second appearance in court.  (*Id.* ¶ 13.)  In addition, if a person who does not require interpretive services wishes to expedite the trial process, "most of the time the [presiding] judge will take [the case] to trial right away to get it adjudicated and resolved immediately."  (*Id.* ¶ 14.)

In contrast, JCMC holds court sessions on one day per month for persons who request an interpreter.  (D.E. 48-3 ¶ 15.)  That day—typically the first Wednesday of the month—is called "interpreter day."[4]  (D.E. 48-3 ¶ 15.)  Pursuant to the Interpreter Day Policy, a person who needs interpretive services is not automatically provided an interpreter on an interpreter day; rather, he or she first must attend an initial appearance before a judge to specifically request one.  (*Id.* ¶¶ 16–21.)  Thereafter, JCMC staff will process the person's request and adjourn his or her hearing to a future interpreter day on which the requested interpreter may be provided.  (*Id.* ¶¶ 16, 18, 21; D.E. 49-2 ¶ 41.)  Such adjournments are not always to the nearest interpreter day, (D.E. 51-1 ¶ 36), and an adjournment to a specific interpreter day does not guarantee that JCMC will supply the relevant interpreter on that day, (D.E. 48-3 ¶¶ 36, 50, 52).  This has been the practice of JCMC for at least 16 years.  (*Id.* ¶ 24.)

---

[4] This policy ("Interpreter Day Policy") applies equally to persons who are deaf and persons who speak languages other than English or Spanish.  (D.E. 49-2 ¶¶ 26–27.)

### C.  Adjudicating the Ticket

On January 8, 2020, Plaintiff contacted JCMC to request the assistance of an ASL interpreter at his then-upcoming hearing.[5]  (*Id.* ¶¶ 28, 31.)  JCMC staff denied Plaintiff's request and instead advised him to direct his petition to the judge presiding over his initial court hearing.  (D.E. 48-3 ¶ 31.)  On January 22, 2020, Plaintiff arrived at JCMC and awaited[6] his initial appearance (*id.* ¶ 35); however, because no ASL interpreter was present, the presiding judge wrote a note to Plaintiff explaining that the hearing would be adjourned to March 4, 2020, an interpreter day.[7]  (D.E. 48-3 ¶¶ 35–37.)

Prior to his March 4, 2020 hearing, Plaintiff twice contacted JCMC staff.  First, on February 10, 2020, Plaintiff called JCMC to "get clarification on the January 22 hearing."  (*Id.* ¶ 47.)  Plaintiff was told that the January 22 hearing "was an arraignment date where he had to plead guilty or not."[8]  (*Id.* ¶ 47.)  Later, on February 26, 2020, Plaintiff again contacted JCMC staff to

---

[5] As noted earlier in this Opinion, Plaintiff communicates primarily in ASL.  (D.E. 48-3 ¶¶ 1–2; D.E. 49-2 ¶ 1.)  He can also communicate by reading and writing in English and by using Ecuadoran Sign Language, but he cannot understand spoken English by reading lips.  (D.E. 49-2 ¶¶ 2–3.)  To contact JCMC on January 8, 2020, Plaintiff used a Sorenson Video Relay Service ("VRS"), a service that assists deaf or hearing-impaired individuals to place and receive phone calls.  (D.E. 48-3 ¶¶ 28–29.)  As explained by the Federal Communications Commission:

> The VRS caller, using a television or a computer with a video camera device and a broadband (high speed) Internet connection, contacts a VRS [Communications Assistant ("CA")], who is a qualified interpreter.  They communicate with each other in sign language through a video link.  The VRS CA then places a telephone call to the party the VRS user wishes to call.  The VRS CA relays the conversation back and forth between the parties.

(*Id.* ¶ 30.)

[6] The parties dispute the amount of time Plaintiff waited prior to his appearance before the presiding judge.  Defendant contends that Plaintiff waited an estimated thirty minutes, while Plaintiff asserts that it may have been more than an hour.  (D.E. 51-1 ¶ 11.)

[7] It is undisputed that JCMC held an interpreter day on February 4, 2020.  (D.E. 51-1 ¶ 36.)  The parties dispute the reason why Plaintiff's hearing was not adjourned to that day.  (*Id.*)

[8] The transcript of the January 22, 2020 proceeding shows that Plaintiff was neither read his rights, nor provided an opportunity to enter a plea.  (*Id.* ¶ 37.)

ensure an ASL interpreter would be present at the March 4, 2020 interpreter day. (*Id.* ¶ 49.) JCMC staff, once again, informed Plaintiff that he could not request an ASL interpreter prior to his hearing. (*Id.*)

On March 4, 2020, Plaintiff returned to JCMC, expecting that he would be provided an ASL interpreter. (*Id.* ¶ 50.) After waiting for approximately an hour, Plaintiff was informed via handwritten note that JCMC did not have any ASL interpreters available. (*Id.* ¶¶ 51–52.) Plaintiff grew "very emotional and really frustrated because of the communication barrier" and because JCMC had again failed to furnish an ASL interpreter. (*Id.* ¶ 53.) JCMC staff adjourned Plaintiff's hearing to the next interpreter day—April 1, 2020. (*Id.* ¶ 54.) Plaintiff's hearing was adjourned several times thereafter.[9] (*Id.* ¶¶ 55–58.)

Eventually, on August 5, 2020, almost a year after issuance of the Ticket, Plaintiff attended a virtual court hearing at which an ASL interpreter was present. (D.E. 48-3 ¶ 60.) During that hearing, a judge found Plaintiff not guilty of the parking violation: the evidence showed that Plaintiff had received the ticket at 8:04 p.m., but parking was prohibited in the bus lane only from 7:00 a.m. until 7:00 p.m. (*Id.* ¶ 61; D.E. 48-11 at 2.) The presiding judge then waived Plaintiff's parking ticket fees and restored his suspended license. (D.E. 48-3 ¶ 62.) After an additional delay, Plaintiff's license was officially restored by the NJMVC on September 15, 2020.[10] (D.E. 48-3 ¶ 64.) It is undisputed that the Ticket could have been resolved on January 22, 2020, if JCMC had provided an ASL interpreter to Plaintiff. (*Id.* ¶ 57.)

---

[9] It is undisputed that the adjournments following the March 4, 2020 interpreter day were due to the onset of the COVID-19 pandemic. (D.E. 49-2 ¶ 21.)

[10] On August 5, 2020, JCMC sent to NJMVC correspondence restoring Plaintiff's license. (*Id.* ¶¶ 63–64; D.E. 49-2 ¶ 25.) Plaintiff's license was not reinstated by NJMVC until September 15, 2020. (D.E. 48-3 ¶¶ 63–64; D.E. 49-2 ¶ 25.)

### D.  Procedural History

On December 1, 2020, Plaintiff initiated the instant suit against the State of New Jersey, the Administrative Office of the Courts of New Jersey (together with the State of New Jersey, the "State Defendants"), and the City of Jersey City ("City").  (D.E. 1.)  The Complaint alleged the following claims:  (1) violations of Title II of the ADA, 42 U.S.C. § 12131 *et seq.*; (2) violations of Section 504 of the RA, 29 U.S.C. § 794; and (3) violations of the NJLAD, N.J. Stat. Ann. § 10:5-1 *et seq.*  (*See generally id.*)  On May 20, 2021, this Court granted the State Defendants' motion to dismiss and denied the City's motion to dismiss.  (D.E. 21.)  On July 14, 2021, the City filed an answer to the Complaint.  (D.E. 23.)  Following discovery, the parties filed the instant cross-motions for summary judgment.  (D.E. 48, 49.)  The parties timely completed briefing.  (D.E. 48–53.)

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphases in original).  A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law."  *Id.* at 248.  A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this initial burden, the burden then shifts to the nonmovant who "must set forth specific facts showing that there is a genuine issue for trial." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018) (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)) The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof[,]" then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322–23. In considering a motion for summary judgment, this Court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651, 656–57 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 255).

"This standard does not change when the issue is presented in the context of cross-motions for summary judgment." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). In such cases, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Id.* (quoting 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2720 (3d ed. 2016)).

### III.    DISCUSSION

Here, both parties have moved for summary judgment under Rule 56.   (D.E. 48, 49.)
Although the issues discussed in each motion largely overlap—indeed, the briefing for each
motion cross-references the briefing from the other—this Court will "rule on each party's motion
on an individual and separate basis."  *Auto-Owners Ins. Co.*, 835 F.3d at 402.  This Court will first
discuss the issue of liability before reaching the parties' contentions regarding the appropriate
relief.

### A.  Liability

#### 1.  Plaintiff's Motion for Partial Summary Judgment

Plaintiff brings claims under the ADA, the RA, and the NJLAD.  Accordingly, this Court
"will confine [its] discussion to the ADA with the understanding that the principles will apply
equally to the [RA] and NJLAD claims."[11] *Chisolm v. McManimon*, 275 F.3d 315, 324 n.9 (3d
Cir. 2001).

"Title II of the ADA prohibits discrimination against the disabled in public services,
programs, and activities."  *Disability Rts. N.J., Inc. v. Comm'r, N.J. Dep't of Hum. Servs.*, 796
F.3d 293, 301 (3d Cir. 2015) (citing *Tennessee v. Lane*, 541 U.S. 509, 517 (2004)).  Its core

---

[11] Claims brought under the RA are governed by the same standards that apply to ADA claims.  *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 260 (3d Cir. 2013) (citing *Chambers ex rel. Chambers v. Sch. Dist. Of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009)); *see also Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 116–17 (3d Cir. 2018) ("[W]hen a plaintiff sues under both the RA and the ADA, we often 'address both claims in the same breath,' 'constru[ing] the provisions of [both statutes] in light of their close similarity of language and purpose.'  Although we may depart from this approach on questions of reach and remedies, we generally apply 'the same standard for determination of liability.'" (second and third alterations in original) (citations omitted)).

Likewise, "[b]ecause the NJLAD 'relies on the same analytical framework' as the ADA, claims under it can be addressed alongside those under the ADA."  *Stone v. N.J. Admin. Off. of the Cts.*, 557 F. App'x 151, 154 (3d Cir. 2014) (quoting *McNemar v. Disney Store, Inc.*, 91 F.3d 610, 618 (3d Cir. 1996)); *see also Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 157 n.14 (3d Cir. 2017) ("[T]he requirements for failure to accommodate claims under [the NJLAD] have been interpreted in accordance with the [ADA]."  (third alteration in original) (quoting *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 n.12 (3d Cir. 2006))).

provision states: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[12] 42 U.S.C. § 12132.  Thus, to prove a violation of Title II, a plaintiff must show that:  (1) he is a qualified individual with a disability, (2) who was excluded from the services, programs, or activities of a public entity, or was subjected to discrimination by any such public entity, (3) by reason of his disability.  *Disability Rts. N.J.*, 796 F.3d at 301 (citing 42 U.S.C. § 12132).   Here, Defendant disputes only the second and third elements—*i.e.*, that Plaintiff experienced discrimination at JCMC by reason of his disability.[13]

Pursuant to the ADA, the Attorney General has promulgated regulations to root out discrimination by public entities against individuals with disabilities.[14]  *See generally* 28 C.F.R. § 35.130.  Those regulations "ha[ve] the force of law," *Helen L.*, 46 F.3d at 332, and "require public entities to take 'appropriate steps' to ensure that communication with a disabled person is as effective as communication with others." *Chisolm*, 275 F.3d at 325 (quoting 28 C.F.R. § 35.160(a)).  Public entities, therefore, must furnish "appropriate auxiliary aids and services," "[w]here necessary to afford individuals with disabilities . . . an equal opportunity to participate

---

[12] The RA provides that "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).  The NJLAD similarly states that "[a]ll persons shall have the opportunity to obtain . . . all the accommodations, advantages, facilities, and privileges of any place of public accommodation . . . without discrimination because of . . . disability." N.J. Stat. Ann. § 5-4.

[13] It is undisputed that Defendant is a public entity subject to the ADA, the RA, and the NJLAD.  (D.E. 49-1 at 10–11.)

[14] The ADA "directs the Attorney General to promulgate regulations necessary to implement Title II."  *Helen L. v. DiDario*, 46 F.3d 325, 331 (3d Cir. 1995) (citing 42 U.S.C. § 12134(a)).

in, and enjoy the benefits of, a service, program, or activity of a public entity."[15]   28 C.F.R.

§ 35.160(b)(1).  For deaf and hearing-impaired individuals, such auxiliary aids and services may

include:

> Qualified interpreters on-site or through video remote interpreting (VRI) services; notetakers; real-time computer-aided transcription services; written materials; exchange of written notes; telephone handset amplifiers; assistive listening devices; assistive listening systems; telephones compatible with hearing aids; closed caption decoders; open and closed captioning, including real-time captioning; voice, text, and video-based telecommunications products and systems, including text telephones (TTYs), videophones, and captioned telephones, or equally effective telecommunications devices; videotext displays; accessible electronic and information technology; or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing.[16]

28 C.F.R. § 35.104(1).

The regulations promulgated by the Attorney General acknowledge that the "type of

auxiliary aid or service necessary to ensure effective communication will vary in accordance with"

several factors, including:  "the method of communication used by the individual; the nature,

length, and complexity of the communication involved; and the context in which the

---

[15] This duty to furnish auxiliary aids and services is subject to "[t]he lone regulatory limitation . . . embodied in Section 35.164 of the subpart," which "provides that a public entity may be relieved of its duty only upon proving that, considering all funding and operating resources available, the proposed action would result in either (1) a fundamental alteration in the nature of the service, program or activity or (2) undue financial or administrative burdens." *Chisolm*, 275 F.3d at 325.  The burden is on the public entity to show that the provision of auxiliary aids would result in such alteration or burden.  28 C.F.R. § 35.164.  In addition, a public entity seeking protection under Section 35.164 must also comply with its procedural requirements—*i.e.*, the decision that providing auxiliary aids would result in a fundamental alteration or administrative burden "must be made by the head of the public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity and must be accompanied by a written statement of the reasons for reaching that conclusion."  *Id.*  Even if a public entity demonstrates that an accommodation would result in a fundamental alteration or undue burden, it still must "take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that, to the maximum extent possible, individuals with disabilities receive the benefits or services provided by the public entity."  *Id.*

[16] This list is not exhaustive.  *See* 28 C.F.R. Pt. 35, App. A ("[T]he inclusion of a list of examples of possible auxiliary aids in the definition of 'auxiliary aids' should not be read as a mandate for a title II entity to offer every possible auxiliary aid listed in the definition in every situation.").

communication is taking place."  28 C.F.R. § 35.160(b)(2).  Nevertheless, a public entity must "give primary consideration to the requests of individuals with disabilities."  *Id.*  Indeed, a public entity is required to provide to deaf individuals their preferred auxiliary aid unless it can demonstrate "that either (1) the alternative aid and/or service provided was effective[17] or (2) provision of the requested aid and/or service would not be required under Section 35.164." *Chisolm*, 275 F.3d at 327 (citing 28 C.F.R. Pt. 35, App. A).

Here, when viewing the undisputed facts in the light most favorable to Defendant, it is clear that JCMC failed to comply with the ADA's regulatory directives and, thus, discriminated against Plaintiff.  There is no dispute that Plaintiff proactively—and repeatedly—requested an ASL interpreter, and that Defendant failed to provide one for months before the onset of the COVID-19 pandemic.  Specifically, on January 8 and February 26, 2020, Plaintiff called JCMC staff to ask for the assistance of an ASL interpreter at his then-upcoming hearings; and both times, JCMC staff refused.  (D.E. 48-3 ¶¶ 31, 49.)  Instead, they told Plaintiff to request an ASL interpreter at his in-person hearing.  (*Id.* ¶¶ 31, 49.)  When Plaintiff showed up to his hearing on January 22, 2020, however, he was afforded neither an ASL interpreter nor any other auxiliary aids.  (*Id.* ¶¶ 35–36.) As a result, the presiding judge informed Plaintiff by handwritten note that his hearing was adjourned to the interpreter day on March 4, 2020—at which time an ASL interpreter would be present.  (*Id.* ¶¶ 35–37.)  But on March 4, 2020, again no ASL interpreter was present, and in turn, Plaintiff's hearings were adjourned further.

In sum, the undisputed facts show that, rather than honoring Plaintiff's request for an ASL interpreter, Defendant chose an alternative option:  no accommodation at all.  Failing to provide a

---

[17] "Generally, the effectiveness of auxiliary aids and/or services is a question of fact precluding summary judgment," *Chisolm*, 275 F.3d at 327 (collecting cases); however, "[i]n order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability."  28 C.F.R. § 35.160(b)(2).

deaf person access to the courts—as Defendant did here—is unquestionably discrimination under the ADA.  *See Lane*, 541 U.S. at 522 ("Title II . . . seeks to enforce th[e] prohibition on irrational disability discrimination.  But it also seeks to enforce a variety of other basic constitutional guarantees, infringements of which are subject to more searching judicial review.  These rights include some, like the right of access to the courts at issue in this case, that are protected by the Due Process Clause of the Fourteenth Amendment." (internal citations omitted)).

Defendant raises a series of counterarguments, which, it believes, absolves it from any liability in this case.  This Court addresses each argument in turn and finds them unpersuasive.  First, Defendant avers that it made all reasonable efforts to provide proper accommodations, and so, it claims, there was no discrimination.  (D.E. 50 at 7–9.)  Defendant's contention is misguided.  As an initial matter, Defendant seemingly conflates[18] the directives in the NJLAP with the regulations promulgated by the Attorney General, (*id.*); the former is its own policies and procedures, and the latter is, of course, what controls in this case.  *See Chisolm*, 275 F.3d at 325 ("Because Title II was enacted with broad language and directed the Department of Justice to promulgate regulations as set forth above, *the regulations* which the Department promulgated *are entitled to substantial deference.*  (quoting *Helen L.*, 46 F.3d at 331–32)).  Defendant, then, misconstrues its duty to reasonably accommodate persons who are deaf.  Importantly, "reasonable efforts" do not satisfy a public entity's obligation under the ADA to accommodate individuals with disabilities[19]; "[t]he test to determine the reasonableness of a modification is whether it alters the

---

[18] In its brief, Defendant erroneously suggests that the directives in its New Jersey Language Access Plan ("NJLAP")—rather than the regulations promulgated by the Attorney General—are "controlling" and "entitled to substantial deference."  (*Id.* at 8.)

[19] Indeed, reasonable efforts would not even satisfy Defendant's purported obligations under the NJLAP, which, as Defendant states, requires "*[e]very effort . . .* be made to identify the need for language assistance and to notify the interpreting unit of a need or future need as early as possible."  (D.E. 50 at 8 (emphasis added).)

essential nature of the program or imposes an undue burden or hardship in light of the overall program.'" *Helen L.*, 46 F.3d at 337 (quoting *Easley*, 36 F.3d at 305). Defendant has made no such showing here.

Second, Defendant argues that its Interpreter Day Policy constitutes a reasonable accommodation. (D.E. 50 at 9–13.) That argument plainly ignores the regulations promulgated by the Attorney General and the facts of this case. Pursuant to the ADA, the Attorney General set forth general prohibitions against discrimination, which prohibit a public entity from, *inter alia*: denying deaf persons "the opportunity to participate in or benefit from" the public entity's services, 28 C.F.R. § 35.130(b)(1)(i); affording deaf persons "an opportunity . . . that is not equal to that afforded others," 28 C.F.R. § 35.130(b)(1)(ii); and using "criteria or methods of administration . . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability," 28 C.F.R. § 35.130(b)(3)(i). The Interpreter Day Policy violates each of those regulatory directives. Under the Interpreter Day Policy, Plaintiff's access to JCMC was both restricted and unreliable: it required him to attend an initial appearance—without any interpreter or auxiliary aids—in order to request an interpreter; it afforded him only one preset day per month on which he could potentially have access to an ASL interpreter; and, finally, it did not reasonably guarantee him that an interpreter would be present on the assigned interpreter day. By contrast, persons without disabilities were given extensive access to JCMC. To be sure, they could attend JCMC from Monday through Friday; schedule an adjournment to any weekday session, depending on the court's calendar; resolve parking tickets almost always on the first or second appearance; and request an expedited trial, which the judge would grant "most of the time . . . to get [the case] adjudicated and resolved immediately." As such, the Interpreter Day Policy violated the general

prohibitions against discrimination when it subjected Plaintiff to infrequent, inconsistent, and delayed access to JCMC—hurdles to which persons without disabilities were not subjected.

Furthermore, Defendant's actions pursuant to the Interpreter Day Policy violate the regulatory requirement to "ensure that communication with a disabled person is as effective as communication with others." *Chisolm*, 275 F.3d at 325 (quoting 28 C.F.R. § 35.160(a)). Although the effectiveness of an auxiliary aid is generally a question for the jury, *id.* at 327 (collecting cases), "to be effective, auxiliary aids and services must be provided in accessible formats, [and] in a timely manner." 28 C.F.R. § 35.160(b)(2). The undisputed facts of this case establish that interpreter day was neither accessible nor timely for Plaintiff; it was merely a day on which JCMC directed deaf persons, like Plaintiff, to show up without an ASL interpreter and *hope* one was there. Limiting deaf persons' access to the court to only one day per month—a day on which an ASL interpreter *might* be present—is not a reasonable accommodation. Accordingly, no reasonable juror could find that Defendant supplied Plaintiff with effective auxiliary aids from January through March 2020.

Third, Defendant asserts that requiring a full-time ASL interpreter would impose an undue burden on JCMC. (D.E. 50 at 9–12.) That argument misses the point. Plaintiff did not seek—and does not seek through this lawsuit—a full-time ASL interpreter at JCMC; he instead asked JCMC to allow him to request and be assigned an ASL interpreter in advance of his initial appearance. Because Defendant chose not to honor Plaintiff's request, it was required to show that such an accommodation "would cause undue financial or administrative burdens." *Chisolm*, 275 F.3d at 327 (citing 28 C.F.R. Pt. 35, App. A). Defendant has not made any such showing here—it offers only a general reference to the infrequent need for ASL interpreters and claims that the Interpreter Day Policy was enacted as a "cost-saving measure." That ASL interpreters are needed sparingly,

14

however, suggests that neither the financial nor the administrative burden of providing one would be undue.  Further, Defendant cannot discriminate against deaf persons for the sake of unspecific and seemingly miniscule "cost-savings"—indeed, that is precisely the behavior that Title II sought to root out.  *Lane*, 541 U.S. at 533 ("[O]rdinary considerations of cost and convenience alone cannot justify a [public entity's] failure to provide individuals with a meaningful right of access to the courts.").  In sum, Defendant cannot seek refuge in Section 35.164's undue burden exception, because it has plainly failed to comply with the requirements thereunder.[20]

Fourth, Defendant insists that Plaintiff did not suffer injuries because he was eventually given an ASL interpreter.[21]  (D.E. 50 at 13–16.)  This argument is wholly unsupported.  Plaintiff was unable to drive for nine months, at least in part, because of Defendant's failure to timely supply an ASL interpreter.  Prior to the suspension of his driving privileges, Plaintiff had been

---

[20] As explained earlier in this Opinion, the burden is on Defendant to show that there would be a fundamental alteration or undue burden.  28 C.F.R. § 35.164.  Defendant must also have complied with the procedural requirements—the decision that providing an accommodation would result in such burdens must have been made "*by the head of the public entity or his or her designee* after considering all resources available for use in the funding and operation of the service, program, or activity," and it must have been "accompanied by a written statement of the reasons for reaching that conclusion.  *Id.* (emphasis added).  Here, Defendant has not argued—much less, demonstrated—that it has complied with the requirements of Section 35.164.  While this Court recognizes that Defendant's policies and accommodations must be viewed in light of Jersey City's resource constraints, Defendant has utterly failed to carry its burden to show that allowing Plaintiff to request an interpreter in advance of his appearances would result in an undue burden.

[21] Here and throughout the briefing on both motions, Defendant seemingly argues that Plaintiff could or should have engaged in communications by handwritten notes.  As an initial matter, the burden is on Defendant—not Plaintiff—to take all reasonable steps to accommodate individuals with disabilities.  *See Chisolm*, 275 F.3d at 325 ("Generally, regulations require public entities to take 'appropriate steps' to ensure that communication with a disabled person is as effective as communications with others." (quoting 28 C.F.R. § 35.160(a))); *see also* 28 C.F.R. § 35.160(b)(1) ("A public entity *shall furnish* appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." (emphasis added).  Moreover, the undisputed factual record indicates that Plaintiff was given notes directing him to reschedule his hearings so that an ASL interpreter could be provided.  Defendant's suggestion that Plaintiff—unaccompanied by an ASL interpreter and unable to hear or read lips—should have rejected the judge's instructions is unreasonable.  In any event, as explained earlier in this Opinion, Defendant was required to provide Plaintiff with his preferred auxiliary aid—*i.e.*, an ASL interpreter—unless it demonstrated that another effective auxiliary aid was provided, or that supplying an ASL interpreter would have resulted in an undue burden.  Defendant has done neither.

using his car to help friends in exchange for money. At a minimum, the loss of that income constitutes cognizable injury.

Finally, Defendant blames its delays in furnishing an ASL interpreter on the COVID-19 pandemic. (D.E. 50 at 19–21.) As Defendant admits, the COVID-19 pandemic and its affiliated restrictions took hold after Plaintiff's March 4, 2020 appearance. Defendant's discrimination against Plaintiff cannot be excused by an event that postdates it.

For the foregoing reasons, Plaintiff's Motion will be granted as to Defendant's liability under the ADA, RA, and NJLAD.

2. Defendant's Motion for Summary Judgment

Defendant raises two main arguments in support of its motion for summary judgment on the issue of liability. First, Defendant contends that Plaintiff was not excluded from participating in his hearing. (D.E. 49-1 at 12–18.) Second, it claims that Plaintiff failed to prove intentional discrimination, *i.e.*, that JCMC discriminated against him "solely due to his disability." (*Id.* at 18–23.) These arguments are unsupported by law and the undisputed facts, and therefore, Defendant's motion must be denied.

As explained earlier in this Opinion, this Court finds that JCMC failed to accommodate Plaintiff's disability, thereby effectively prohibiting him from gaining meaningful access to the court system to resolve the Ticket. Defendant's attempt to distinguish two similar cases decided in this District is unavailing. (*Id.* at 12–18.) The undisputed facts and circumstances of the instant matter show that Defendant discriminated against Plaintiff, and in any event, the distinctions raised by Defendant are not dispositive nor do they warrant an alternative analysis.

Defendant's final argument—that Plaintiff failed to prove that his disability was the "sole reason" for his discriminatory treatment—is unfounded.[22]   The ADA does not "condition[] its protections upon a finding of intentional or overt 'discrimination,'" *Helen L.*, 46 F.3d at 335, and plaintiffs asserting claims under the ADA need only show "but for causation," *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 300 n.4 (3d Cir. 2007).   Put simply, in failure-to-accommodate cases brought under the ADA, a plaintiff need only prove that "but for the failure to accommodate, he would not be deprived of the benefit he seeks."  *Muhammad v. Ct. of Common Pleas of Allegheny Cnty., Pa.*, 483 F. App'x 759, 764 (citing *Good Shepherd Found., Inc. v. City of Momence*, 323 F.3d 557, 561–62 (7th Cir. 2003)).   Plaintiff has undoubtedly done so here.

Defendant has failed to raise any arguments that support judgment in its favor, and accordingly, its motion for summary judgment must be denied.

**B.  Relief**

Having ruled on liability, this Court now turns to the parties' contentions about the appropriate relief.

### 1.  Plaintiff's Request for a Permanent Injunction

Plaintiff moves this Court to issue a permanent injunction, ordering Defendant "to provide interpreters to deaf individuals for their first appearances, . . . to provide interpreters more than one day a month," and to conduct new training for JCMC staff.  (D.E. 48-2 at 28–30.)  Plaintiff

---

[22] Notably, Defendant erroneously argues that it treats persons who are deaf just like people who speak any language besides English and Spanish—*i.e.*, all persons who need interpreters (other than Spanish interpreters) must attend an initial appearance and specifically request one be present at their next interpreter day.   But language-based discrimination may constitute a form of national origin discrimination under Title VI of the Civil Rights Act, *see, e.g.*, *T.R. v. Sch. Dist. of Phila.*, 223 F. Supp. 3d 321, 335 (E.D. Pa. 2016) ("[L]anguage based discrimination can constitute an actionable form of national origin discrimination."), and as such, comparing Plaintiff's access to that of another protected class is off base.   Plainly stated, equal discrimination against different protected classes is still discrimination.  In this case, the correct comparator group is persons who have full access to the services provided by JCMC—English and Spanish speakers.   And when comparing the extensive access that JCMC gives to English and Spanish speakers to the restricted and unreliable access it affords persons who are deaf, the discrimination is clear.

does not have Article III standing to seek a permanent injunction, and therefore, his request must be denied.

"A plaintiff bears the burden of establishing that he has Article III standing for each type of relief sought." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 301 (3d Cir. 2012) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).   To demonstrate standing to seek injunctive relief, a plaintiff must show:

> (1) that he is under a threat of suffering "'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical"; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that a favorable judicial decision will prevent or redress the injury.

*Id.* (quoting *Summers*, 555 U.S. at 493).   Previous injury alone is not enough to justify injunctive relief; "the equitable remedy of an injunction is 'unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again[.]'"   *Id.* (citing *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983)). "Accordingly, a plaintiff may have standing to pursue damages, but lack standing to seek injunctive relief."   *Id.* (citing *Lyons*, 461 U.S. at 105).

Here, Plaintiff does not have standing to pursue a permanent injunction.   Although he has experienced past harm from JCMC's discrimination, Plaintiff has failed to demonstrate a "real or immediate threat that [he] will be wronged again."   *ZF Meritor, LLC*, 696 F.3d at 301 (citing *Lyons*, 461 U.S. at 111).   While it is true that Plaintiff may again appear before JCMC to resolve a parking ticket, the "threatened injury must be certainly impending and proceed with a high degree of certainty."   *McCray v. Fidelity Nat'l Ins. Co,*, 682 F.3d 229, 242–43 (3d Cir. 2012) (internal marks and citation omitted).   Mere "[a]llegations of possible future injury are not sufficient to

satisfy Article III." *Id.* at 243.  Consequently, Plaintiff's request for a permanent injunction must be denied.

    2.  <u>Plaintiff's Request for Nominal Damages</u>

Plaintiff next asks this Court to award him nominal damages.  (D.E. 48-2 at 28–30.) "Nominal damages have traditionally 'vindicated deprivations of certain "absolute" rights that are not shown to have caused actual injury. . . .'" *CMR D.N. Corp. v. City of Phila.*, 703 F.3d 612, 627 (3d Cir. 2013) (quoting *Carey v. Piphus*, 435 U.S. 247, 266 (1978)).  However, they "are not a consolation prize for the plaintiff who pleads, but fails to prove, compensatory damages.  They are instead the damages awarded by default until the plaintiff establishes entitlement to some other form of damages, such as compensatory or statutory damages." *Uzuegbunam v. Preczewski*, 141 S.Ct. 792, 800 (2021) (citations omitted).

Here, Defendant does not dispute Plaintiff's request for nominal damages.  Therefore, having found that Defendant discriminated against Plaintiff in violation of the ADA, the RA, and the NJLAD, this Court awards Plaintiff nominal damages in the amount of $1.00.

    3.  <u>Defendant's Request to Bar Compensatory and Punitive Damages</u>

Defendant moves for summary judgment on the issue of Plaintiff's entitlement to compensatory and punitive damages.  (D.E. 49-1 at 24–26.)  Genuine issues of material fact remain as to the extent of Plaintiff's compensatory damages and his entitlement to punitive damages.  As a result, Defendant's Motion must be denied.

In cases brought under the ADA or the RA, compensatory relief cannot be awarded unless the plaintiff demonstrates that the defendant engaged in "intentional discrimination." *Durrell*, 729 F.3d at 262.[23]  No such showing is required for a plaintiff to recover compensatory damages under

---

[23] To show intentional discrimination, a plaintiff may prove that the defendant's discrimination was a product of "discriminatory animus or deliberate indifference." *Id.* at 263–64.  Deliberate indifference requires a showing that the

the NJLAD.  N.J. Stat. Ann. § 10:5-13 ("All remedies available in common law tort actions shall be available to prevailing plaintiffs."); *Tarr v. Ciasulli*, 853 A.2d 921, 928 (N.J. 2004).  Moreover, while a plaintiff cannot recover punitive damages under the ADA or the RA, *Barnes v. Gorman*, 536 U.S. 181, 189 (2002); *Bowers v. Nat'l Collegiate Athletic Ass'n*, 346 F.3d 402, 429–30 (3d Cir. 2003), such relief is available under the NJLAD, *Pritchett v. State*, 256 A.3d 999, 1012 (N.J. 2021) ("There can be no doubt that punitive damage awards under the [NJ]LAD are available against public sector defendants.").  Punitive damages, however, will only be awarded in "exceptional circumstances" where a plaintiff demonstrates that the "defendant displayed actual malice or acted in a willful and wanton manner."  *Victor v. State*, 952 A.2d 493, 506–07 (N.J. Super. Ct. App. Div. 2008); *Abbamont v. Piscataway Twp. Bd. of Educ.*, 650 A.2d 958, 970 (N.J. 1994) ("In [NJ]LAD actions, in cases of 'willful or malicious acts' caused by the entity itself, full damages, including punitive, may be awarded." (quoting *Fuchilla v. Layman*, 510 A.2d 281, 284 (N.J. Super. Ct. App. Div. 1986), *aff'd*, 537 A.2d 652 (N.J. 1988))

Here, the undisputed facts indicate that Plaintiff has experienced pecuniary losses and emotional distress as a result of Defendant's discrimination.  These are injuries for which Plaintiff may recover compensatory damages under the NJLAD.  Furthermore, genuine issues of material fact exist with respect to whether Defendant acted in a willful and wanton manner by enacting and maintaining a discriminatory policy for at least 16 years and by denying Plaintiff's multiple requests for an accommodation.  Accordingly, Defendant's motion to bar compensatory and punitive damages must be denied.[24]

---

defendant had "both (1) knowledge that a harm to a federally protected right is substantially likely, and (2) [failed] to act upon that likelihood." *Id.* at 263 (citations and quotation marks omitted).

[24] This Court notes that punitive damages are available only in "exceptional cases," *Victor*, 952 A.2d at 506–07, "where the offending conduct 'is particularly egregious,'" *Gares v. Willingboro Twp.*, 90 F.3d 720, 728 (3d Cir. 1996)

IV.     **CONCLUSION**

For the reasons set forth above Plaintiff's partial motion for summary judgment is hereby

**GRANTED IN PART AND DENIED IN PART**.  Defendant's motion for summary judgment is

hereby **DENIED**.  An appropriate order follows.


 /s/ Susan D. Wigenton  
**SUSAN D. WIGENTON, U.S.D.J.**


Orig:   Clerk
cc:     André M. Espinosa, U.S.M.J.
        Parties


---

(quoting *Abbamont*, 650 A.2d at 970).  While this Court has denied Defendant's motion to preclude punitive damages
at this stage, it may revisit the issue subsequent to the presentation of evidence at trial.